UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JOSH PERROTTA,**

        **Plaintiff,**

v.                                    Case No: 6:24-cv-1638-PGB-LHP

**FIRST EDGE, LLC and ERIC VALDES,**

        **Defendants.**
_____/

## **ORDER**

This cause comes before the Court on Defendants First Edge, LLC ("**First Edge**"), and Eric Valdes' ("**Valdes**")[1] Motion to Dismiss Amended Complaint. (Doc. 29 (the "**Motion**")). Plaintiff Josh Perrotta ("**Plaintiff**") filed a response in opposition. (Doc. 38 (the "**Response**")). Upon consideration, the Motion is due to be granted in part and denied without prejudice in part.

**I.   BACKGROUND**

    **A.   The Amended Complaint and the Motion**

Through this action, Plaintiff brings a series of claims related to an agreement (Doc. 20-1 (the "**Joint Venture Agreement**")) he made with First Edge through Valdes. (*See generally* Doc. 20 (the "**Amended Complaint**")). The facts as alleged in the operative Amended Complaint are as follows.

---

[1]   Herein, First Edge and Valdes will collectively be referred to as the "Defendants."

Defendant First Edge holds itself out as a "wealth management company in the secondary market in the petroleum reselling industry." (*Id.* ¶ 14 (internal quotation marks omitted)). Valdes is First Edge's chief executive officer ("**CEO**"), managing director, and day-to-day operator. (*Id.* ¶¶ 1, 21; Doc. 20-1, p. 5). Plaintiff entered into the Joint Venture Agreement with First Edge on approximately May 29, 2023. (Doc. 20, ¶ 15). The Joint Venture Agreement was "based on the sale of crude oil and refined petroleum products[] internationally." (*Id.*). Therein, in relevant part, First Edge agreed that it would provide a 100% return on investment for Plaintiff's investments in the subject joint venture. (*See id.* ¶¶ 18, 20; Doc. 20-1, p. 2). The investment term was for one year. (Doc. 20, ¶ 19).

The Joint Venture Agreement states that it was signed by Plaintiff and by Valdes as managing director for First Edge. (Doc. 20-1, p. 5). Further, it contains the following language regarding dispute resolution:

> 7. <u>Dispute Resolution.</u> In the event of any controversy or claim arising out of or relating to this Agreement, or a breach thereof, the parties hereto will first attempt to settle the dispute by mediation, administered by the International Centre for Dispute Resolution in accordance with its International Mediation Rules. If the settlement [sic] is not reached within sixty (60) days after the service of a written demand for mediation, any unresolved controversy or claim will be settled by arbitration administered by the International Centre for Dispute Resolution in accordance with its Commercial Arbitration Rules. The arbitral tribunal will be composed of one arbitrator. The seat of arbitration will be Houston, Texas and the language to be used in the arbitral proceedings will be English. The arbitrator shall provide a reasoned award and may award attorney's fees to the prevailing party. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(*Id.* at p. 3 (the "**Arbitration Provision**")).

On May 31, 2023, Plaintiff wired Valdes a $223,200 investment pursuant to the Joint Venture Agreement. (Doc. 20, ¶ 20). However, Valdes never wired the funds to First Edge and Defendants never invested the funds. (*Id.*). Instead, Valdes commingled the funds with his personal money and with funds from another company. (*Id.* ¶¶ 20, 36). Thus, after receiving the wire, "Valdes started a calculated barrage of misstatements to ignore [Plaintiff] and failed to return the investment back." (*Id.* ¶ 24). Then, in August 2023, Plaintiff entered into a contract with Valdes in his individual capacity whereby Valdes agreed to pay Plaintiff $595,000 in five installments (the "**Installments Agreement**"). (*Id.* ¶¶ 44–49). The Amended Complaint implies, and Plaintiff confirms in his Response, that the $595,000 was "for the return of [Plaintiff's] investment" under the Joint Venture Agreement.[2] (Doc. 38, p. 3). However, Valdes refused to pay each of the first three installments as they came due. (Doc. 20, ¶ 49).

At bottom, Plaintiff alleges that Defendants engaged in "complex fraudulent schemes" to defraud Plaintiff and others and to enrich Valdes. (*Id.* ¶¶ 1, 14). As a result, Plaintiff filed the Amended Complaint, which contains three counts against

---

[2] Plaintiff provides scant details about the formation of the Installments Agreement in the Amended Complaint. (*See* Doc. 20, ¶¶ 44–50). Indeed, the factual allegations in the Amended Complaint pertain only to the Joint Venture Agreement, and the purported Installments Agreement is first mentioned in the count alleging the Installments Agreement's breach. (*See generally* Doc. 20). Therein, Plaintiff states that, "[d]espite the [Joint Venture Agreement], [Plaintiff] and Valdes entered into another agreement in August 2024 with Valdes, not First Edge. That agreement is a valid contract with an offer, acceptance, and consideration." (*Id.* ¶ 45). After describing the schedule for the installments due under the agreement, Plaintiff alleges that he accepted the "new terms" by text message and that "the parties both had consideration on their promises on the new terms." (*Id.* ¶¶ 46–47).

Valdes, including for violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Count I), breach of the Installments Agreement (Count III), and unjust enrichment (Count IV). (*Id.* ¶¶ 30–33, 44–54). Further, in Count II, Plaintiff brings a claim of alter ego liability against First Edge, alleging that Valdes has "dominated and controlled First Edge to the extent that Valdes is simply the alter ego of First Edge." (*Id.* ¶¶ 34–43). Thus, through Count II, Plaintiff seeks to pierce First Edge's corporate veil to hold Valdes personally liable for First Edge's conduct. (*See id.* ¶¶ 1, 34–43).

In the Motion, Defendants move to dismiss the Amended Complaint on multiple grounds, including because they argue that Plaintiff's claims fall within the scope of the Arbitration Provision. (Doc. 29).

### B. Clerk's Entry of Default Against First Edge

Of relevance, Defendants filed the Motion through counsel who later sought to withdraw from representation in the case. (Docs. 29, 42, 44). On April 17, 2025, Magistrate Judge Leslie Hoffman Price granted this request. (Doc. 46 (the "**Order Permitting Withdrawal**")). However, in the Order Permitting Withdrawal, the Magistrate Judge noted that the Order would cause First Edge—a limited liability company—to be without counsel in the case. (*Id.* at pp. 1–2). Noting that business entities are forbidden from appearing *pro se* in the Eleventh Circuit, the Magistrate Judge ordered that First Edge must cause counsel to appear on its behalf within thirty days of the Order Permitting Withdrawal. (*Id.*). The Magistrate Judge further warned that First Edge's failure to comply with this directive would "result

4

in default being entered against First Edge, LLC without further notice." (*Id.* at p. 2 (emphasis removed)).

The next day, on April 18, 2025, the instant Court entered an Order staying this matter on unrelated grounds. (Doc. 47). The Court lifted the stay on June 18, 2025. (Doc. 50). As a result of the stay, on June 20, 2025, the Magistrate Judge entered an Order *sua sponte* revisiting the issue of defense counsel's withdrawal. (Doc. 51 (the "**Second Order on Withdrawal**")). Therein, the Magistrate Judge provided First Edge with an additional thirty days to cause counsel to appear on its behalf, again warning that its "[f]ailure to do so will result in the imposition of Clerk's default without further notice." (*Id.* at p. 2 (emphasis removed)). Thus, under the Second Order on Withdrawal, First Edge was required to cause counsel to appear on its behalf on or before July 21, 2025. (*See id.* at pp. 1–2).

On August 5, 2025, First Edge had still not caused counsel to appear on its behalf. Thus, on the aforementioned date, the Magistrate Judge entered an Order directing the Clerk of Court to enter default against First Edge. (Doc. 58). The Clerk of Court followed this directive the next day, on August 6, 2025. (Doc. 59). Of note, pursuant to Local Rule 1.10(c), "[w]ithin thirty-five days after entry of a default, the party entitled to a default judgment must apply for the default judgment or must file a paper identifying each unresolved issue—such as the liability of another defendant—necessary to entry of the default judgment." This deadline elapsed on September 10, 2025. (*See* Doc. 59). However, to date, Plaintiff has still not complied with Local Rule 1.10.

5

## II. LEGAL STANDARD

The Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 1–16, makes certain written arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA applies to all "written" agreements to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Sections 1 and 2 of the FAA define the field of arbitrable agreements and codify a federal "policy favoring arbitration" that makes "arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (cleaned up). Sections 3 and 4 of the FAA provide "two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, [] § 3, and an affirmative order to engage in arbitration, § 4." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). Specifically, Section 4 of the FAA permits a court to compel arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4.

## III. DISCUSSION

In the Motion, Defendants argue that the Arbitration Provision applies to the claims in the Amended Complaint. (Doc. 29, pp. 4–6). Defendants thus contend the parties were required to attempt to settle the instant dispute by

6

mediation, and if mediation failed, to proceed to arbitration of Plaintiff's claims. (*Id.* at p. 4).

In advancing this argument, Defendants note that in the first iteration of Plaintiff's Complaint (Doc. 1 (the "**Initial Complaint**")), Plaintiff had sued First Edge for its breach of the Joint Venture Agreement. (*See id.*). Defendants moved to dismiss the Initial Complaint on various grounds, including because Defendants asserted the Joint Venture Agreement required arbitration of Plaintiff's claims. (Doc. 15). Thus, Defendants now contend that, in the Amended Complaint, Plaintiff strategically replaced his claim alleging First Edge's breach of the Joint Venture Agreement with his claim alleging Valdes' breach of the Installments Agreement in an effort to avoid the Arbitration Provision.[3] (*See* Doc. 29, pp. 5–6). Defendants argue that the claims in the Amended Complaint nonetheless fall within the bounds of the Arbitration Provision. (*Id.* at p. 6).

In construing arbitration agreements, courts generally apply state law principles relating to contract formation, interpretation, and enforceability. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005). Under Florida law,[4] a party has a right to arbitrate where: "(1) a valid, written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue

---

[3]  The Court additionally notes that, in the Initial Complaint, Plaintiff also brought a securities claim against both First Edge and Valdes. (Doc. 1, ¶¶ 28–31). The securities claim against First Edge is absent from the Amended Complaint while the securities claim against Valdes remains. (Doc. 20, ¶¶ 30–33).

[4]  The Joint Venture Agreement states that it will be interpreted in accordance with Florida law. (Doc. 20-1, p. 3).

exists; and (3) the right to arbitration has not been waived." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999) (citation omitted). Plaintiff's arguments opposing arbitration fall under the umbrella of the first two requirements. (*See* Doc. 38, pp. 9–12).

As a threshold matter, it is worth noting that Plaintiff raises two focused arguments in opposition to arbitration. (*Id.*). One argument concerns who may invoke the Arbitration Provision and the other concerns whether that provision mandates, or merely permits, arbitration. (*Id.*). Putting these arguments aside, the parties appear to agree that the Arbitration Provision constitutes a valid agreement. (*See* Doc. 29, pp. 4–6; Doc. 38, pp. 9–12). Moreover, there is no basis for the Court to find otherwise.[5]

The Court thus turns to Plaintiff's specific arguments in opposition to arbitration. First, Plaintiff argues that the Arbitration Provision cannot be enforced by either Defendant. (Doc. 38, pp. 11–12). Plaintiff asserts that First Edge cannot enforce the Arbitration Provision despite being a party to the Joint Venture Agreement due to Plaintiff's allegations that First Edge is merely the alter ego of Valdes. (*Id.*). Plaintiff fails to cite any legal authority in support of this premise and the Court finds it to be unpersuasive. (*Id.*); *see Kaiser v. Alexander Marine, USA*, No. 23-cv-108-RBD-RMN, 2023 WL 6494779, at *2 (M.D. Fla. Aug. 18, 2023) (applying Florida law to hold that all of the defendants in the case could compel

---

[5] To establish a contract exists under Florida law, the party seeking enforcement must prove offer, acceptance, consideration, and sufficient specification of essential terms. *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). Each of these elements is met in the instant case.

the plaintiff to arbitration where the plaintiff had "allege[d] an agency or alter ego relationship between all [d]efendants").

Plaintiff also asserts that the Arbitration Provision cannot be enforced by Valdes, since he is technically a non-party to the Joint Venture Agreement, having signed it only in his capacity as CEO of First Edge. (Doc. 38, pp. 11–12). "The issue of whether a non[-]signatory to an agreement can use an arbitration clause in that agreement to force a signatory to arbitrate a dispute between them is controlled by state law." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017) (citation omitted). Under Florida law, although non-signatories are generally not bound to the subject arbitration agreements under such circumstances, there are several recognized exceptions to this rule. *Taylor Grp., Inc. v. Indus. Distribs. Int'l Co.*, 859 F. App'x 439, 444 (11th Cir. 2021).[6] One such exception applies where, as here, the plaintiff sues the non-signatory under an alter ego or veil piercing theory. *E.g.*, *id.*; *Kaiser*, 2023 WL 6494779, at *2. Under Florida law, to pierce the corporate veil, a plaintiff must show the following:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence[ ] was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

---

[6] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

*Tuckman v. JPMorgan Chase Bank, N.A.*, No. 20-11242, 2021 WL 3357953, at *4 (11th Cir. Aug. 3, 2021) (quoting *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2001)). Plaintiff has clearly alleged the appropriate elements as to Valdes. (*E.g.*, Doc. 20, ¶¶ 34–43). This places Valdes squarely within a recognized exception to the usual rule that would otherwise prevent him, as a non-party to the Joint Venture Agreement, from invoking its Arbitration Provision.

Further, under Florida law, a non-signatory to an arbitration agreement can also compel arbitration of a signatory's claims under an equitable estoppel theory. *Taylor Grp.*, 859 F. App'x at 444. This exception applies "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non[-]signatory." *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 944 (Fla. 1st DCA 2004) (quoting *Westmoreland v. Sadoux*, 229 F.3d 462, 467 (5th Cir. 2002)); *see also Roman v. Atl. Coast Constr. & Dev., Inc.*, 44 So. 3d 222, 224 (Fla. 4th DCA 2010); *Kroma Makeup*, 845 F.3d at 1354. Put differently, "[o]ne cannot both take advantage of contract provisions to seek to impose liability on an individual professional and at the same time avoid another contract term or provision for which it has no use." *Giller v. Cafeteria of S. Beach Ltd.*, 967 So. 2d 240, 242 (Fla. 3d DCA 2007) (citing *United Contractors, Inc. v. United Constr. Corp.*, 187 So. 2d 695, 701–02 (Fla. 2d DCA 1966)).

While Plaintiff's Amended Complaint removes Plaintiff's claim against First Edge for breach of the Joint Venture Agreement, all three of the claims raised by Plaintiff in the Amended Complaint remain intimately connected to the terms of

10

the Joint Venture Agreement. (*See generally* Docs. 1, 20, 20-1). First, to succeed on Plaintiff's Rule 10b-5 securities fraud claim against Valdes (Count I), Plaintiff must prove "(1) a false statement or omission of material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's injury." *Robbins v. Kroger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (citation omitted). Ultimately, Plaintiff's securities fraud claim is premised entirely upon Defendants' purported fraudulent misrepresentations in securing Plaintiff's investment under the Joint Venture Agreement; Plaintiff's reliance upon those representations, inducing Plaintiff to make the investment under the Joint Venture Agreement; and, Defendant's failure to return any of the investment to Plaintiff, as was required by the Joint Venture Agreement, proximately causing Plaintiff's injury. (*See* Doc. 20, ¶¶ 16–27, 30–33). As a result, Plaintiff is estopped from preventing Valdes from invoking the Arbitration Provision as to this count. *See Koechli*, 870 So. 2d at 944.

Similarly, Plaintiff's claim for Valdes' breach of the Installments Agreement (Count III) will, by definition, require Plaintiff to rely upon the terms of the Joint Venture Agreement. (*See id.* ¶¶ 44–50). As alleged, the parties could only have entered the Installments Agreement to remedy First Edge's breach of the Joint Venture Agreement. (*E.g.*, *id.* ¶¶ 46–47 (alleging that Valdes offered by text to make $595,000 worth of payments in installments to Plaintiff, who "accepted the *new terms* in August 2024 via text message" (emphasis added))). Plaintiff will have the burden of proving that the Installments Agreement was a valid contract,

11

including that Valdes received adequate consideration in exchange for his promise to pay Plaintiff the subject installments. *See St. Joe Corp.*, 875 So. 2d at 381. This consideration could only relate to First Edge's breach of the Joint Venture Agreement, such as Plaintiff's agreement to forbear legal action as to the breach in exchange for Valdes' promise to pay the installments. (*See* Doc. 20, ¶¶ 44–50).

Plaintiff's claim for unjust enrichment of Valdes in Count IV suffers the same fate. (*See id.* ¶¶ 51–54). In this count, Plaintiff alleges that Valdes has received the benefit of Plaintiff's investment money "since May 2023, in the amount of at least $223,200," and that "[t]he circumstances render Valdes's retention of the benefit inequitable unless Valdes pay[s] [Plaintiff] for the value of the benefit." (*Id.* ¶¶ 52–54). Here, the referenced benefit is Plaintiff's investment made under the Joint Venture Agreement. (*See id.* ¶¶ 52–53). Further, "[t]he circumstance[] [that] render[s] Valdes's retention of the benefit inequitable" is Plaintiff's failure to get what he bargained for under that agreement—i.e., First Edge's breach of the Joint Venture Agreement. (*See id.* ¶ 54); *see also Armas v. Prudential Secs., Inc.*, 842 So. 2d 210, 212 (Fla. 3d DCA 2003) (holding a defendant who was a non-signatory to a contract containing an arbitration clause could invoke the clause as to the plaintiff's unjust enrichment claim under an estoppel theory because the plaintiff's claim "mad[e] reference to or presume[d] the existence of" the subject contract).

Plaintiff cannot seek to take advantage of provisions in the Joint Venture Agreement to impose liability on Valdes and, at the same time, disclaim the applicability of the Arbitration Provision as to Valdes. *See Giller*, 967 So. 2d at 242.

Accordingly, Valdes is permitted to compel arbitration of Plaintiff's claims under a theory of equitable estoppel.

In Plaintiff's second argument in opposition to arbitration of his claims, Plaintiff asserts that the Arbitration Provision is "permissive" rather than "mandatory." (Doc. 38, pp. 9–11). In support, Plaintiff argues that the Arbitration Provision is comprised of a "garden variety contract," which Plaintiff asserts distinguishes it from the arbitration provisions in Defendants' cited cases, *Solymar Investments Ltd. v. Banco Santandar S.A.*, 672 F.3d 981 (11th Cir. 2012), and *Lobo v. Celebrity Cruises, Inc.*, 488 F.3d 891 (11th Cir. 2007). (Doc. 38, pp. 9–10). The arbitration clause in *Solymar*, Plaintiff notes, contained language requiring the parties to arbitrate "*exclusively* in the courts sitting in Geneva, Switzerland." (*Id.* at p. 10 (emphasis added)). Plaintiff further highlights that the *Lobo* case contained a "*mandatory* arbitration provision" arising under the Convention Act and argues that under this Act "arbitration is required." (*Id.*).

Plaintiff's arguments fail. While the arbitration agreement in *Solymar* may have stated the parties must "exclusively" arbitrate in the chosen forum, nothing in that case requires a party to use this precise wording to mandate arbitration of relevant claims. 672 F.3d at 988. To the contrary, the law set forth in *Solymar* reaffirms many well-established principles relevant here, including that even "garden variety" arbitration agreements are enforceable under the FAA. *Id.* ("Because of the FAA, federal courts are required to place arbitration clauses on equal footing with other contracts." (citations omitted)). Indeed, as the *Solymar*

Court notes, "federal courts interpret arbitration clauses broadly where possible," and thus, "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Id.* (internal citations and quotation omitted).

These principles further undermine Plaintiff's attempt to distinguish *Lobo*. (*See* Doc. 38, pp. 9–10). While it is true that arbitration provisions can be mandatory under the Convention Act, they can be equally mandatory under the FAA. *See, e.g.*, *Solymar*, 488 F.3d at 988.

Of additional relevance, in its sole reference to the "mandatory" nature of the arbitration provision at issue in *Lobo*, the court does not reference the fact that the provision is governed by the Convention Act rather than the FAA. *See* 488 F.3d at 893. Instead, in this passage, the Court characterizes the provision as "mandatory" based upon the language used by the parties in the provision, stating:

> Celebrity moved to dismiss Lobo's lawsuit on the grounds that, pursuant to the . . . collective bargaining agreement, his wage claim must be sent to arbitration. Specifically, Article 26 of the collective bargaining agreement contains a mandatory arbitration provision providing that disputes "arising on the vessels or in connection with this Agreement" "*shall*" be submitted to arbitration.

*Id.* (emphasis added). Thus, the *Lobo* court described the arbitration provision as "mandatory" because the parties had agreed that relevant disputes "shall" be submitted to arbitration. *Id.*

Here, the parties have used like language indicating that the Arbitration Provision is mandatory rather than permissive. Specifically, the Arbitration Provision states that the parties "*will* first attempt to settle [disputes governed by

14

the Arbitration Provision] by mediation, administered by the International Centre for Dispute Resolution in accordance with its International Mediation Rules." (Doc. 20-1, p. 3 (emphasis added)). Then, "[i]f the settlement is not reached within sixty (60) days after the service of a written demand for mediation, any unresolved controversy or claim *will* be settled by arbitration administered by the International Centre for Dispute Resolution in accordance with its Commercial Arbitration Rules." (*Id.* (emphasis added)). This language does not leave any room for discretion by the parties and thus, like the provision in *Lobo*, is mandatory. *See* 488 F.3d at 893.

Further, although not raised by Plaintiff, the Court finds that the claims raised in the Amended Complaint fall within the Arbitration Provision's broad scope. *See Caley*, 428 F.3d at 1368. The Arbitration Provision applies to "any controversy or claim arising out of or relating to this agreement, or a breach thereof." (Doc. 20-1, p. 3). "It is well established that the courts broadly construe arbitration provisions containing the language, 'arising out of or relating to,' such that in certain instances the clause will include non-signatories." *Cuningham Hamilton Quiter, P.A. v. B.L. of Miami, Inc.*, 776 So. 2d 940, 942 (Fla. 3d DCA 2000) (collecting cases). When interpreting arbitration agreements containing such provisions, the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause." *Kaiser*, 2023 WL 6494779, at *3 (quoting *Seifert*, 750 So. 2d at 638). As the Court

15

explained *supra* in its application of the theory of equitable estoppel, the claims in the Amended Complaint are intimately bound to the Joint Venture Agreement. Thus, these claims fall within the scope of the Arbitration Provision. *See id.*

Additionally, Plaintiff does not argue that Defendants have waived their right to arbitration and the Court finds no evidence of such a waiver. *See Caley*, 428 F.3d at 1368. Under Florida law, a court must consider the totality of circumstances in assessing whether a waiver of the right to arbitrate has occurred. *Derriman v. Mizzen & Main LLC*, 710 F. Supp. 3d 1129, 1135 (M.D. Fla. 2023). Soon after defense counsel's first appearance in the case, Defendants filed their motion to dismiss the Initial Complaint, which contained Defendants' argument that the Arbitration Provision governed Plaintiff's claims. (Docs. 12, 15). After Plaintiff filed the Amended Complaint, Defendants reasserted this argument through the instant Motion. (Docs. 20, 29). Consequently, the Court finds that Defendants have not acted inconsistently with the right to compel arbitration and, thus, no waiver of this right has occurred. *See Truly Nolen of Am., Inc. v. King Cole Condo. Ass'n, Inc.*, 143 So. 3d 1015, 1017 (Fla. 3d DCA 2014) (finding the defendant had not waived the right to arbitrate as it had "asserted its right to compel arbitration simultaneously with its motion to transfer venue and as its *first* action in the lawsuit.").

Finally, the Court must address the matter of the pending default against First Edge. Under Federal Rule of Civil Procedure 55(c), "[t]he court may set aside an entry of default for good cause." The Court notes that, at the inception of this

16

case, Defendants promptly invoked their right to arbitrate this matter *through counsel*—and did so long before the circumstances that gave rise to the entry of default occurred. (*See* Docs. 15, 51). Additionally, Plaintiff has not timely complied with the requirements of Local Rule 1.10(c). Thus, upon careful consideration of the circumstances, the Court finds good cause to set aside the default so the parties may proceed to mediation, and if necessary, arbitration, pursuant to the Arbitration Provision. *See* FED. R. CIV. P. 55(c). As a result, the Court does not reach the remaining arguments raised by Defendants for the dismissal of Plaintiff's claims and such arguments are due to be denied without prejudice.

## IV.    CONCLUSION

For the reasons set forth herein, it is **ORDERED AND ADJUDGED** as follows:

1. The Clerk of Court is **DIRECTED** to **VACATE** the default entered against Defendant First Edge, LLC. (Doc. 59).

2. Defendants' Motion to Dismiss Amended Complaint (Doc. 29) is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**.

3. Plaintiff Josh Perotta and Defendants First Edge, LLC and Eric Valdes shall proceed to mediation and, if applicable, arbitration in accordance with the terms of the Joint Venture Agreement. (Doc. 20-1).

4. The case is hereby **STAYED** pending the conclusion of the arbitration proceedings. The Clerk is **DIRECTED** to administratively close the file. The Court retains jurisdiction of the case to adjudicate any post-arbitration motions the parties may make. Consequently, the parties are **DIRECTED** to file status reports regarding the pendency of the arbitration proceedings. The parties shall provide written status reports every ninety (90) days hereafter.

5. Defendants' Motion to Dismiss Amended Complaint (Doc. 29) is **DENIED WITHOUT PREJUDICE** in all other respects.

**DONE AND ORDERED** in Orlando, Florida on September 22, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties